UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

GREGORY PRENDERGAST,

                    Plaintiff,

        v.

PACIFIC INSURANCE COMPANY, LIMITED,

                  Defendant.
_____

<u>DECISION & ORDER</u>

09-CV-6248P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Gregory Prendergast ("Prendergast") seeks a declaratory judgment that his sports card insurance policy issued by Pacific Insurance Company ("Pacific") was in effect at the time that his collection was stolen and that he complied with all policy conditions required to maintain full coverage.  (Docket # 1, Complaint).  Pursuant to 28 U.S.C. § 636(c), the parties have consented to have a United States magistrate judge conduct all further proceedings in this case, including the entry of final judgment.  (Docket # 10).

Currently pending before this Court is Pacific's motion for summary judgment. (Docket # 34).[1]  Because the issues raised by Pacific involve disputes of material fact, the motion is denied.

---

[1] Pacific also seeks an order requiring Prendergast to produce the cash remaining from his inheritance. This Court denied that same request on an earlier motion to compel and will not revisit the ruling here.  (Docket # 31).

## FACTUAL BACKGROUND

The following is a summary of the undisputed facts in this matter, except where otherwise noted.[2]

### A.  Insurance of Prendergast's Sports Card Collection

Prior to 2006, Prendergast insured a sports card collection through Lloyd's of London.  (Docket ## 34-29 at ¶ 1; 40-24 at ¶ 2).  In May of 2006, Prendergast obtained a new insurance policy from Pacific, which provided coverage for his collection in the amount of $200,000.  (Docket ## 34, Ex. B; 40-24 at ¶ 3).  To obtain the coverage, Prendergast was required to estimate the replacement value of "each major type collectible," although he was not required to submit a professional appraisal of the collection's value.  (Docket # 40-24, Ex. A).

Prendergast based his estimate on an appraisal prepared by Yankee Clipper House of Cards in 2005.  (Docket ## 34, Ex. C; 34-29 at ¶ 4).  The appraisal contained an eight-page handwritten inventory of the cards, which listed the type and number of cards, as well as an associated "value."  (Docket # 34, Ex. C).  The appraiser did not inspect the collection, but accepted Prendergast's representation as to its contents; in estimating value, the appraiser used the Beckett Book[3] and accepted Prendergast's representation that all of the cards were in "[near mint] to mint condition."  (*Id.*).

---

[2]  Prendergast failed to oppose defendant's statement of undisputed facts or to submit his own statement of undisputed facts.  Accordingly, defendant's statement of undisputed facts is deemed admitted in accordance with Local Rule of Civil Procedure 56(a)(2).  *See Monter v. Delta Air Lines, Inc.*, 2002 WL 1628086, *1 (W.D.N.Y. 2002) (uncontroverted statement of undisputed facts deemed admitted to the extent that facts are supported by the record).

[3]  As defendant's expert has explained, "the Beckett Book is a catalog that lists individual cards and purported 'value.'  This is akin to a Kelley Blue Book for vehicles."  (Docket # 30-19 at ¶ 10).

According to Prendergast, in March or April of 2007, a man who introduced himself as "Robert" came to his house and offered to sell him a sizable sports card collection. (Docket # 34, Ex. N at 82-84).  Without inspecting the collection, Prendergast agreed to buy the collection of approximately nine million sports cards[4] for $450,000 in cash.[5]  (*Id*. at 83-85).  Prendergast never learned "Robert's" last name or how to contact him and never obtained a receipt for the purchase.  (*Id*. at 84-86).  After Prendergast agreed to buy the collection sight-unseen, he leased a facility in a commercial building located at 1149 Culver Road in Rochester, New York, for the purpose of storing the new collection.  (Docket ## 34, Ex. E; 34-29 at ¶ 6).  Sometime between April 15, 2007 and May 15, 2007, Robert delivered 385 boxes, each containing 25,000 cards, to Prendergast at the storage facility.  (Docket ## 40, Exs. D, F; 34, Ex. N at 88-89, 92).  Prendergast also moved his original collection to the facility.  (Docket # 34, Ex. J at 68-69).

On May 15, 2007, Prendergast applied to Pacific to increase his coverage from $200,000 to $4,000,000 based upon his purchase of Robert's collection.  (Docket # 34, Ex. D). According to Prendergast, his estimate that the collection was worth that amount was based upon a "price structure" provided by Robert, as well as Prendergast's sampling of the cards in each box and his review of the Beckett Book.  (Docket # 34, Ex. J at 40, 44).  Specifically, Prendergast testified that each box that Robert delivered contained information about its contents written on the box lid.  (*Id*. at 39-40, 42).  The lid noted the type and number of cards in each

---

[4]  Initially, Prendergast claimed that he had purchased thirteen million cards.  (Docket # 34-1 at ¶ 38).

[5]  Prendergast asserts the money that he used to purchase the cards came from a $650,000 cash inheritance from his grandfather that Prendergast had hidden in his house after receiving it.  (*Id*. at 90).

box, as well as a price range.  (*Id*. at 44, 46).  Prendergast testified that he opened each box to

verify that its contents corresponded to the notations on the lid and to ensure that the cards were

in excellent condition.  (*Id*. at 41-42).  He admitted that he did not look at every single card.

(*Id*.).  Prendergast then compared the box's "price structure" to the Beckett Book, considering the

types of cards and their condition, to arrive at the estimated value of $4 million.  (*Id*. at 44-46).

Prendergast recorded his work through a series of hash marks on a separate box lid.  (Docket

# 34, Ex. O).

   In order to obtain the increased coverage for theft, Pacific required Prendergast to

install a central alarm system.  (Docket ## 34-29 at ¶ 7; 34-20 at ¶ 7; 40-24 at ¶ 7).  Prendergast

contracted with ADT to do so.  (Docket # 34-29 at ¶ 7).  The system that ADT installed consisted

of an alarm on the front door and a motion detector, but did not include an alarm on the back

door of the storage space.[6]  (Docket ## 34, Ex. J at 56-60; 34-29 at ¶ 10).  Prendergast did not

disclose to Pacific the fact that the back door was not alarmed.  (Docket # 34, Ex. J at 60).  After

receiving ADT's paperwork reflecting the alarm's installation, defendant issued a change

endorsement increasing to $4 million the limit of coverage for burglary and theft.  (Docket ## 34,

Ex. G; 34-29 at ¶ 9).  Pacific has submitted an affidavit from one of its underwriters asserting

that it would not have increased the coverage had it been aware that the back door was not

alarmed.  (Docket # 34-20 at ¶ 9).

---

  [6] Prendergast claims that he personally installed a video camera system on the premises and placed a GPS tracking system inside one of the boxes.  (Docket # 34, Ex. J at 58, 60-61, 76; 40-24 at ¶ 9).

B. **The Reported Burglary and Theft of Prendergast's Collection
   and Pacific's Denial of Coverage**

On September 14, 2007, Prendergast reported to the Rochester Police Department

that his storage facility had been burglarized and his sports card collection had been stolen.

(Docket ## 34-29 at ¶ 14; 34, Ex. H; 40-24 at ¶¶ 10-11).  According to the police report,

Prendergast reported that the burglary had occurred sometime between September 9th and 14th

and that the burglar must have entered through the back door to his facility because the front door

was alarmed.  (Docket # 34, Ex. H).

Prendergast subsequently notified Pacific of the theft and submitted a Proof of

Loss form to the company, which estimated the total value of the loss at $4 million.  (Docket

# 34, Ex. I).  The Proof of Loss included an inventory consisting of a brief list of six items.  The

handwritten inventory reads in full:

> baseball, basketball, football some hockey
> mostly Topps years 1965-03
> 200 boxes 25,000 154 baseball 20 basketbal[l]
> 17 football 9 hockey range 1¢ to 34¢
> 5 million cards ave 20¢ 1 million
>
> 120 boxes 25,000 75 baseball 25 basketbal[l]
> 13 football 7 hockey range 35¢ to 74¢
> 3 mill[i]on cards ave 54¢ 1,620,000
>
> 40 boxes 25,000 28 baseball 7 basketball
> 3 football 2 hockey 75¢ - [$]5 ave $1 doll[a]r
> card 1 million
>
> plus 25 boxes 25,000 625,000 400 book 25-50 pa[ck]
> 500 ca[rds] or put together
>
> 10 boxes 12 50 ave rookies or special ca[  ]

> 92-93 classic draft pick Fleer McDonald
> com[m]ons.

(Docket # 34-1, Ex. I).

By letter dated February 26, 2008, Pacific denied coverage on the grounds that Prendergast failed to satisfy the policy's protective safeguard condition, failed to document the value of loss and made material misrepresentations concerning both.  (Docket # 34, Ex. K).

### C.  **Prendergast's Policy**

The policy at issue contained the following relevant terms:

> 1.   Protective Safeguard Required
>
> When we issued this policy, we determined the premium based on information you gave us about the burglary and theft safeguards that you maintain, and which is stated in the Protective Safeguards Schedule section of the Declaration of this policy.  As a condition of this insurance, you are required to maintain the "Protective Safeguard(s)" shown in that Schedule for the respective premises.
>
> 2.   Payment Limitation
>
> We will not pay more than $60,000 for Covered Loss caused by or resulting from "Burglary or Theft" if, prior to the "Burglary or Theft", you failed to keep the applicable "Protective Safeguard" in complete working order.

(Docket # 34, Ex. G).  The policy defined protective safeguard as a "central station alarm" or "an alarm which sounds at a location which is continually monitored to provide a response and is away from the designated premises."  (*Id*. at § E(4)(c)).

The policy contained the following terms governing Pacific's obligation to pay Prendergast in the event of "a covered loss":

6

We will pay the lesser of:

> (1)   The cost to replace the Covered Property with
>        property of similar quantity and quality; or
>
> (2)   The necessary expense to restore the damaged item
>        to its condition immediately prior to the damage.

If the Covered Property cannot be replaced or repaired, then we
will pay the appraised value set by a competent authority.

If the value can not be set by the competent authority, then we will
pay the purchase price.

(*Id.* at § D(14)).

Finally, the policy provided:

This policy is void in any case of fraud by you as it relates to this
coverage at any time.  It is also void if you or any insured, at any
time, intentionally conceal or misrepresent a material fact
concerning:

> a.   This policy;
> b.   The covered property;
> c.   Your interest in the Covered Property; or
> d.   A claim under this policy.

(*Id.* at § D(7)).

### D.  Pacific's Expert Report

In support of its motion for summary judgment, Pacific has submitted an affidavit

from its retained expert, Derek Grady ("Grady").  (Docket # 34-19).  According to Grady, "it is

impossible to assign an accurate value to the cards . . . without a more detailed list of the cards

[Prendergast] possessed at the time of the loss."  (*Id.* at ¶ 3).  Grady has opined, however,

"[b]ased upon my experience I can state with a reasonable degree of certainty that the plaintiff's

entire collection is worth approximately $20,000-$25,000."  (*Id.* at ¶ 6).  His assessment is based

7

"upon the assumption that the collection is as the plaintiff described in his application, proof of loss and deposition testimony." (*Id.*). Grady has further affirmed that he has never seen a box containing 25,000 cards – most boxes hold 5,000 cards and weigh approximately twenty-five pounds – and that only a "handful" of collectors possess collections valued over $1 million, which are "well documented and inventoried." (*Id.* at ¶¶ 12-13).

## DISCUSSION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reaching this determination, the court must assess whether there are any disputed material facts and, in so doing, must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 166-67 (2d Cir. 1991). A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248; *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d at 97.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, after which the non-moving party must come forward with sufficient evidence to support a jury verdict in its favor; the motion will not be defeated based upon conjecture, surmise or the existence of "metaphysical doubt" concerning the facts. *Bryant*

*v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586 (1986)).  The party seeking to avoid summary judgment "must

do more than make broad factual allegations and invoke the appropriate statute.  The [party] must

also show, by affidavits or as otherwise provided in Rule 56 . . . , that there are specific factual

issues that can only be resolved at trial."  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995);

*see also Driscoll v. Townsend*, 60 F. Supp. 2d 78, 80 (W.D.N.Y. 1999).

>       As the Second Circuit has explained:
>
> > [T]he trial court's task at the summary judgment motion stage of
> > the litigation is carefully limited to discerning whether there are
> > any genuine issues of material fact to be tried, not to deciding
> > them.  Its duty, in short, is confined at this point to issue-finding; it
> > does not extend to issue-resolution . . . .  [I]t must be kept in mind
> > that only by reference to the substantive law can it be determined
> > whether a disputed fact is material to the resolution of the dispute.

*Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

>       Pacific contends that it is entitled to summary judgment on two independent

grounds: first, that Prendergast cannot prove the value of the sports card collection; and, second,

that Prendergast made fraudulent misrepresentations to Pacific that voided the insurance policy.

(Docket # 34).  Pacific also argues that Prendergast failed to comply with the protective

safeguards provision of the policy, thus limiting his coverage for theft to no more than $60,000.

(*Id.*).

## I.  Value of the Loss

>       I turn first to Pacific's contention that Prendergast cannot establish that the stolen

collection had any value.  As an initial matter, I note that the Complaint's "wherefore" clause

seeks a declaratory judgment that his policy was "in full effect at the time of the Plaintiff's loss

and that the Plaintiff complied with all conditions required of him by the Defendant to maintain

full coverage as afforded in the insurance policy." (Docket # 1, Complaint at 7). Although the

clause does not expressly request a determination concerning the amount of coverage, the

preceding paragraph in the Complaint alleges that plaintiff is entitled to $4 million in damages.

Neither party, moreover, disputes that the issue of the value of the collection is part of this action.

An insured who fails to establish that a loss occurred or the value of the loss may

not recover under the policy. *Victoria Camera, Inc. v. Guiffrida*, 566 F. Supp. 796, 798

(S.D.N.Y. 1983) (dismissing complaint because plaintiff had "completely failed to prove the

amount of its loss" where it could not "establish what the levels of inventory were and thus

cannot show the amount of the goods stolen"); *Incardona v. Home Indem. Co.*, 400 N.Y.S.2d

944, 946 (4th Dep't 1977) (trial court properly dismissed claim under homeowner's insurance

where plaintiff failed to submit evidence of home's actual cash value); *Brodman v. Merchants

Fire Assurance Corp. of New York*, 219 N.Y.S.2d 657, 648 (1st Dep't 1960) (judgment reversed

where plaintiff provided no proof of value). Here, although Pacific does not dispute the

existence of Prendergast's collection, it maintains that Prendergast has not submitted competent

evidence to substantiate the value of the stolen card collection.[7] Prendergast counters that the

record establishes that an issue of fact exists as to the collection's value.

_____

[7] In its motion papers, Pacific suggests that summary judgment is warranted because Prendergast's account
of the purchase, delivery and theft of the cards is simply too fantastical to credit. As implausible as Prendergast's
tale may be, "at the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the
truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The
record is sufficient at this stage to raise issues of fact as to Prendergast's version of events. *See Rule v. Brine, Inc.*,
85 F.3d 1002, 1011 (2d Cir. 1996) ("[a]ssessments of credibility and choices between conflicting versions of the
events are matters for the jury, not for the court on summary judgment").

The record before the Court shows that Prendergast submitted a Proof of Loss form to Pacific containing a summary of the inventory of his collection. Whether that inventory, accompanied by his testimony,[8] will prove that the collection had a value of $4 million is a determination that must await a trial and will turn, at least in part, on credibility issues. *See United States v. Am. Home Assurance Co.*, 2003 WL 21436219, *11 (S.D.N.Y. 2003) (monetary value of insured's loss was issue of fact); *A.M. Levinson Furs. v. Centennial Ins. Co.*, 146 N.Y.S.2d 531, 533 (1st Dep't 1955) (value of stolen mink coat was a factual issue properly submitted to jury). Even if that value is found to be unsupported, evidence in the form of an earlier appraisal exists that Prendergast's original collection was worth at least $200,000. Again, the reliability of that appraisal is a determination for trial. Finally, Pacific's own expert has opined that if Prendergast's testimony as to the contents of his collection is credited, the collection is worth at least $20,000. On this record, a factual dispute plainly exists as to the value of the collection.

Moreover, in the absence of "competent authority" establishing the value of the collection, the policy required Pacific to pay the purchase price. Prendergast has sworn that he paid Robert $450,000 for the collection – an assertion that Pacific has reasonably challenged, but not disproved on this motion. That issue likewise will turn on credibility determinations.

---

[8] Although Pacific contends that Prendergast does not qualify as an expert witness under Rule 702 of the Federal Rules of Evidence, Pacific has cited no authority for the proposition that Prendergast must qualify as an expert witness in order to be deemed a "competent authority" under the terms of the policy. "Competent authority" is not a defined term of the policy and thus an issue of fact exists whether Prendergast qualifies as a competent authority under the policy. *See, e.g.*, *Andy Warhol Found. for Visual Arts, Inc. v. Fed. Ins. Co.*, 189 F.3d 208, 215 (2d Cir. 1999) (ambiguous terms of an insurance policy must be construed against the insurer); *Vam Check Cashing Corp. v. Fed. Ins. Co.*, 787 F. Supp. 2d 264, 268 (E.D.N.Y. 2011) (same); *Village Mall at Hillcrest Condominium v. Merrimack Mut. Fire Ins. Co.*, 766 N.Y.S.2d 70, 71 (2d Dep't 2003) (summary judgment properly denied where definition of "pollutant" in policy was ambiguous and question whether asbestos fell within definition presented issue of fact).

Accordingly, I cannot determine as a matter of law that Prendergast has not established a genuine issue of fact as to the value of the collection or the price he paid for it.

## II.  The Validity of the Policy

Pacific contends alternatively that the policy is void because Prendergast made fraudulent misrepresentations as to the value of the collection and the required alarm system. Prendergast urges the Court to find that disputes of material fact preclude summary judgment on this issue, as well.

### A.  Fraud Through Overvaluation

A policy may be voided "if an insured tenders a fraudulent proof of loss as the basis for a recovery under the policy."  *Saks & Co. v. Cont'l Ins. Co.*, 23 N.Y.2d 161, 165 (1968). The insurer bears the burden of proving both the materiality of the misrepresentation, as well as the insured's fraudulent intent.  *Kittner v. Eastern Mut. Ins. Co.*, 915 N.Y.S.2d 666, 670-71 (3d Dep't 2011) (denying summary judgment on issue of fraud where defendant had adduced no proof of intent).  In this case, Pacific contends that even if Prendergast's representations as to the contents of his collection are credited, the collection has a value of no more than $25,000 and Prendergast's Proof of Loss claim for 160 times that amount was a fraudulent and material misrepresentation that voided the policy.  (Docket # 34-30 at 10-11).

A policy will be voided where the insured has "willfully and fraudulently placed in the proofs of loss a statement of property lost which he did not possess, or has placed a false and fraudulent value upon the articles which he did own."  *Saks & Co. v. Cont'l Ins. Co.*, 23 N.Y.2d at 165; *Pipo Bar & Rest., Inc. v. Certain Underwriters at Lloyd's at London*, 792

N.Y.S.2d 82, 82 (2d Dep't 2005). "Overvaluation of insured property raises a presumption of

fraud in proportion as to the excess, and such presumption becomes conclusive where . . . the

insurer demonstrates that the difference between the amounts claimed in the proof of loss and the

losses actually shown to have been sustained are grossly disparate and without reasonable

explanation." *Latha Rest. Corp. v. Tower Ins. Co.*, 831 N.Y.S.2d 411, 412 (1st Dep't 2007)

(granting summary judgment where proof of loss did not account for claimed damages).

Assertion of a mistaken opinion regarding an item's value, however, is not grounds for vitiating a

policy. *Kittner v. Eastern Ins. Co.*, 915 N.Y.S.2d at 670; *see also Nugent v. Rensselaer Cnty.

Mut. Fire Ins. Co.*, 94 N.Y.S. 605, 611 (3d Dep't 1905) (policy not voided by mere misstatement

of the loss based on erroneous opinions of value).

   Here, in response to Pacific's contention that Prendergast fraudulently overvalued

his collection, Prendergast has submitted a sworn affidavit affirming that he did not misrepresent

the value. (Docket # 40-24 at ¶ 16). Prendergast emphasizes that, in valuing the collection, he

relied on the 2005 appraisal of his earlier collection, his inspection of each of the boxes

purchased from "Robert," a comparison of Robert's "price structure" for the cards to the values

listed in the Beckett book, as well as his own experience as an avid sports card collector.

   I find that the issue of whether Prendergast fraudulently misrepresented the

collection's value in his Proof of Loss presents questions of fact – not simply the actual value of

the collection, but also Prendergast's state of mind and intent – that preclude summary judgment.

*Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d at 1224 ("[a] trial court must be cautious

about granting summary judgment when . . . intent is at issue"); *Golden Budha Corp. v.

Canadian Land Co. of Am., N.V.*, 931 F.2d 196, 201-202 (2d Cir. 1991) ("[o]rdinarily, the issue

of fraudulent intent cannot be resolved on a motion for summary judgment, being a factual

question involving the parties' states of mind").

    **B.  The Protective Safeguards Provision**

        Finally, Pacific argues that Prendergast made fraudulent misrepresentations about

the alarm system that nullify the policy.  In the alternative, Pacific seeks to limit Prendergast's

recovery to no more than $60,000 for failure to comply with the protective safeguards condition.

Specifically, the policy included a provision capping coverage at $60,000 in the event that

Prendergast did not keep the alarm system in "complete working order."  (Docket # 34, Ex. G).

        Both parties agree that the increased coverage for theft was conditioned on

Prendergast's installation of a "central station alarm" and that Prendergast retained ADT, a

national security company, to install an alarm in his storage facility.  (Docket # 40 at ¶ 12).  The

parties dispute whether the failure to alarm his facility's back door constituted non-compliance

with the condition and whether Prendergast's failure to advise Pacific that it was not alarmed

constituted a fraudulent and material misrepresentation.

        The policy defined "central station alarm" as "an alarm which sounds at a location

which is continually monitored to provide a response and is away from the designated premises."

(Docket # 34, Ex. G at § E(4)(c)).  No dispute exists that ADT installed a front door alarm and

motion detector that rang to a central monitoring location.  Too many fact questions arise,

however, from the absence of the back door alarm to permit summary judgment.  Among them

are questions of Prendergast's knowledge of the door, the direction that it opened and where it

led; Prendergast's discussions, if any, with ADT about the door; ADT's advice, if any, about

alarming the back door in light of the motion detector; and, the industry definition, if any, of the

term "central station alarm."  *See Edwards v. U.S. Liab. Ins. Co.*, 790 N.Y.S.2d 32, 32 (2d Dep't

2005) (denial of summary judgment proper where numerous issues of fact existed regarding

presence or absence of smoke detectors on property); *Nunez v. U.S. Underwriters Ins. Co.*, 921

N.Y.S.2d 462, 466 (N.Y. Sup. 2011) (denying summary judgment where issue of fact existed

whether plaintiff's smoke detectors were operable at the time she applied for insurance policy).

In addition, an issue of fact exists whether Pacific would have declined the additional theft

coverage had it known that the back door was not alarmed.  *See Ocean Walk, Ltd. v. Lloyd's of

London*, 2006 WL 2689626, *8-9 (E.D.N.Y. 2006) (denying summary judgment because court

"cannot rely merely on the statements of [the underwriter] that he would not have agreed to bind

insurance under the [p]olicy but for [p]laintiffs' representations"; "[i]t is for the fact-finders to

determine whether [insurer] would not have issued the subject insurance [p]olicy, but for the

alleged material misrepresentations").  Some or all of these questions relate to both issues of

knowing concealment and failure to satisfy the condition to coverage and render summary

judgment inappropriate on either.

## <u>CONCLUSION</u>

For the foregoing reasons, the defendant's motion for summary judgment **(Docket # 34)** is **DENIED**.  A conference shall be held on **April 5, 2012**, at **11:45 a.m.**, before the undersigned to schedule a trial date.

**IT IS SO ORDERED.**

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
March __28__, 2012

16